h BROWN, J„
Plaintiffs appeal a judgment dismissing their suit against Reliant Energy Arkla (“Reliant”) after a jury unanimously found that a Reliant service technician was not negligent in an incident involving carbon monoxide emissions and poisoning from an improperly burning furnace. We affirm.

Facts

Plaintiffs, Bruce and Diana Fuhrmann, leased a home located at 1402 Audubon Street in Shreveport from Randy and Velma Hinds of Benton, Louisiana. The Fuhrmanns have three children: Erich, Nicholas and Lauren. Plaintiffs allege that on February 14 and 15, 1999, they were injured by carbon monoxide emissions from a defectively operating heating unit in the home. They contend that their injuries were worsened by the negligence of Reliant.
On the evening of February 14, the Fuhrmanns suspected problems with the furnace when their children complained that they smelled gas. Mr. Fuhrmann looked at the furnace, and, after seeing that it was burning, he went to bed. There were no other natural gas operating appliances inside the home.[1]
Mr. Fuhrmann left for work with a headache the following morning of Febru *1137 ary 15. Mr. Fuhrmann worked for his brother in the business of delivering and installing appliances for retail businesses. On this day they were working for Sears. While at work, Mr. Fuhrmann’s wife called and Igtold him everyone in the house was sick with flu-like symptoms. Mr. Fuhrm-ann returned home.
Mrs. Fuhrmann called Mr. Hinds and spoke with his secretary regarding the central heating unit. The secretary told her to call Arkla (Reliant). At 9:49 a.m., Mrs. Fuhrmann called Reliant. The call was coded “117,” meaning a possible gas leak in the residence. A Reliant technician, Robby Roberson, arrived at the home in approximately 10 minutes. Roberson testified that when he arrived the doors were open, the windows were up, and he assumed that the Reliant dispatcher told the Fuhrmanns to take these measures! He said Mr. Fuhrmann met him at the door. He testified that he mentioned to Mr. Fuhrmann that the leak must have been pretty serious (the doors and windows being open) and Mr. Fuhrmann told him someone at Reliant told him to open the windows and doors or to go to a neighbor’s house.
The Fuhrmanns disagree with this part of Roberson’s testimony. Although suspecting a gas leak, Mrs. Fuhrmann testified that they did not raise the windows until after Roberson finished his work and left the home.
The Reliant dispatcher, Sandra Williams, took the call from Mrs. Fuhrm-ann. She testified that she gave the caller instructions to open the doors and windows; however, she failed to note such instructions in the computer log. Nevertheless, she stated that it was customary practice and her habit to advise callers to open the windows and doors whenever a gas leak or “117” call is reported.
13Roberson testified that when he arrived at the house, he was greeted by Mr. Fuhrmann. When he entered the house, Roberson said that he checked for the presence of gas and carbon monoxide in the air and found none. He asked Mr. Fuhrmann what appliances in the home operated on natural gas. Mr. Fuhrmann showed Roberson the gas furnace. Roberson conducted a “shut-in” test for gas leaks and found none. The furnace thermostat was in the “off’ position. Roberson then turned on the heater, letting it run for 45 seconds and observed that it was burning improperly. He cut the heater off and issued a notification tag to Mr. Fuhrmann regarding the improperly burning heater. Roberson had Mr. Fuhrmann sign the tag and attached the red copy of the tag to the furnace. The tag warns that the appliance is not to be used until corrective action has been taken. On the tag there is a check-box which lists types of appliances and also a check-box each for “leak” and “carbon monoxide.” Roberson checked the box denoting the problem was the “heating unit,” and wrote in the space provide on the tag: “1 of 4 burners not operating properly — cut off and capped.” He did not record or make a notation in the boxes adjacent to “leak” or “carbon monoxide.” Roberson did not find a gas leak, which was the purpose of the call, and he did not measure for carbon monoxide after the initial test he performed when he entered the home. He testified that he told Mr. Fuhrmann that an improperly burning unit could emit carbon monoxide. Roberson left the residence at 10:32 a.m., having been at the home approximately one-half hour.
RRoberson testified that Mr. Fuhrmann never said anything to him about being ill or anyone in the house being ill. He said Mr. Fuhrmann did not exhibit any symptoms of carbon monoxide poisoning, and he did not see anyone else in the house. He *1138 stated that he saw Mr. Fuhrmann working at his computer while he checked out the furnace and hot water heater.
Some time after Roberson left, Mr. Fuhrmann called the Highland Hospital Emergency Room. He then drove to Sears where he and his brother, Gary, were working. He called the Fire Department from a Sears pay telephone at 11:13 a.m. A fire department CAD event report (Computer Aided Dispatch) or caller log stated that the unknown caller reported a possible gas leak, requested an ambulance and hung up. Mr. Fuhrmann returned to the home with Gary, who testified that they removed the family from the home. Fire Department records indicate that the Fuhrmanns were sitting on the lawn complaining of headaches, nausea and vomiting when they arrived. Fire Department personnel tested each of the Fuhrmanns for carbon monoxide poisoning with a Breathalyzer. The tests showed the presence of carbon monoxide in their bloodstream. Mr. Fuhrmann tested at 56 parts per million on the Breathalyzer. According to the testimony of Shreveport Fire Department Captain Ronnie Robinson, who was at the scene, a reading of 80 or greater without symptoms warrants a trip to the hospital; however, a reading of less than 80 with symptoms also warrants a trip to the hospital. Robinson said Mr. Fuhrmann complained of a light headache. Symptoms of carbon monoxide poisoning include headache,_[¿nausea and difficulty breathing. According to the reports, both Mr. and Mrs. Fuhrmann appeared to be alert, conscious and oriented.
Captain Michael Mackey was also a member of the EMT team who went to the Fuhrmann home. He testified that when he arrived the children were sitting out on the lawn and complaining of nausea, vomiting, and headaches. Each had already been tested for carbon monoxide poisoning. The test results showed that Mrs. Fuhrmann had a reading of 57 part per million; Erich Fuhrmann had 71 parts per million; Nicholas Fuhrmann had 50 parts per million; and, Lauren Fuhrmann had 45 parts per million.
The Fuhrmanns were transported by ambulance and private vehicle to a local hospital. There is no record or first hand testimony that the air in the home was actually tested for the presence of carbon monoxide by the fire department. Mr. Fuhrmann testified that the fire department did not check the home for the presence of carbon monoxide. According to Mr. Fuhrmann, the fire chief told him that they could not get a reading because he had opened the windows and doors.
At the hospital, each Fuhrmann family member was tested for elevated carbonox-yhemoglobin, or in lay terms, for the presence of carbon monoxide in their blood. The tests yielded the following results: Mr. Fuhrmann, 18.4%; Mrs. Fuhrmann, 7.9%; Erich Fuhrmann, 9.0%; Nicholas Fuhrmann, 7.6% and Lauren Fuhrmann, 7.9%. The medical records containing the Fuhrmann test results state that a normal level of carbonoxyhemoglobin is less than 2% in a non-smoker, whereas a heavy smoker’s reading would be between 8% and 12%. Mr. Fuhrmann, whose | ¿reading was 13.4%, typically smoked 2 packs of cigarettes per day according to medical records. A life-threatening level of carbo-noxyhemoglobin would be greater than 15%.
In accordance with carbon monoxide poisoning treatment protocol, each family member was placed in a hyperbaric oxygen chamber until their blood gases returned to normal. They were then released that evening.
Plaintiffs subsequently filed suit against Hinds, Allstate Insurance Company, Air Tech Air Conditioning, Inc., whom they *1139 allege had worked on the defective unit in the past, and Reliant Energy Arkla, the natural gas supplier to the home seeking damages for past and future pain and suffering, mental anguish, medical expense, permanent disabilities and impairments and loss of consortium. Plaintiffs reached a settlement with Hinds and Allstate for an undisclosed amount, and a settlement on behalf of the three minor children for $2500 each, plus $8226 in medical expenses. Those claims were dismissed as well as the suit against Air Tech and American Central Insurance Company.
A jury unanimously found that the evidence did not establish that Reliant, its employees or representatives were negligent or at fault. The court rendered judgment dismissing the plaintiffs’ suit. Plaintiffs appeal.

Discussion

A court of appeal may not set aside a finding of fact in the absence of manifest error or unless it is clearly wrong. Reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations |7and inferences are as reasonable. To reverse a fact finder’s determination, the appellate court must conclude that a reasonable factual basis for the finding of the jury does not exist in the record. Stobart v. State Dept. of Transp. & Development, 617 So.2d 880 (La.1993). The task of a reviewing court is to assess whether the fact finder’s resolution of conflicting evidence was reasonable in light of the entire record. Fowler v. Wal-Mart Stores, Inc., 30,843 (La.App.2d Cir.08/19/98), 716 So.2d 511.
In order to recover under the duty-risk analysis, the plaintiff must prove the defendant owed a duty of care to the plaintiff, the requisite duty was breached by the defendant, that the conduct in question was the cause-in-fact of the resulting harm, and the risk of harm was within the scope of protection afforded by the duty breached. Berry v. State Through Dept. of Health and Human Resources, 93-2748 (La.05/23/94), 637 So.2d 412.
Plaintiffs argue that Reliant employee, Robby Roberson, did not tell them to open windows, leave the home, or test the air for carbon monoxide; and that he failed to instruct them of the dangers of carbon monoxide after he determined that the heater was not properly functioning. In short, the plaintiffs contend that their carbon monoxide poisoning was worsened by Roberson’s alleged failure to take the steps named above.
Plaintiffs argue that the Reliant Energy Arkla Gas Distribution Operation & Maintenance Manual (“Manual”), specifically Section 5 of that manual, created a legal duty to follow a carbon monoxide (“CO”) investigation protocol, and Roberson failed to do this. This protocol | ¿requires completion of a form called a “CO First Responder Checklist” in which the service technician obtains details regarding their call for assistance, and air sampling procedures. If the air tests above the level of 200 ppm, the structure is to be evacuated. If the source of the CO is a gas-burning appliance and the condition cannot be corrected, then the appliance is to be disconnected and tagged.
Reliant, on the other hand, argues that proper procedures were followed. It introduced into evidence Section 4 of the Manual which promulgates the proper procedure to follow for “Irregular Conditions on Customer Owned Facilities,” and contemplates circumstances where a service technician encounters a source of danger or risk involving customer-owned equipment. Under the protocol, if a hazardous condition is discovered and cannot be cor *1140 rected, the technician is supposed to disconnect the faulty appliance, complete an “Arkla Notification Tag” and have it signed by a responsible adult who resides at the premises, attach a red copy of the tag to the appliance, advise the customer of the hazard and give the customer a yellow copy of the notification tag.
Obviously, the Reliant Manual procedures are in place to ensure safety and lower the risks of injury or death, and hence, provide a helpful guide in ascertaining whether the service technician acted reasonably under the particular circumstances of this case.
The source of the carbon monoxide poisoning was an improperly burning furnace. Roberson checked for gas leaks, then turned the furnace on and observed that one of its burners was not operating properly. He then jgturned the furnace off, disconnected it, and capped off the gas line. He had Mr. Fuhrmann sign a tag noting that the furnace was not burning properly and attached a red copy to the disconnected furnace.
At this point, the source of carbon monoxide poisoning was removed, and the air in the Fuhrmann home was no longer being contaminated. There is also a reasonable basis in the record to support a finding that the Fuhrmanns had ventilated the home before Roberson arrived. Moreover, Dr. Long, the physician who treated the Fuhrmanns for CO poisoning, testified that as soon as a person is removed from the source of carbon monoxide poisoning and begins breathing normal air, the body begins to “off-gas” the carbon monoxide. Eventually the body will rid itself of all the carbon monoxide; however, breathing pure oxygen causes the body to off-gas much faster.
Although Mr. Fuhrmann testified that he told Roberson that the family had the flu, Roberson testified that Mr. Fuhrmann said nothing about any illness or symptoms. He further testified that Mr. Fuhrmann simply showed him where the furnace was located and then went back working at his computer. Roberson also testified that when he first arrived that he tested the air for carbon monoxide and found none present. He also testified that he told Mr. Fuhrmann that the improperly burning furnace could emit carbon monoxide.
Plaintiffs also allege that Reliant breached a duty to them when they were not told to open the windows and doors of their home or to vacate the home. We note that the Fuhrmanns believed that the gas furnace wasj^making them sick, and Mrs. Fuhrmann called Mr. Hinds’ secretary regarding a possible gas leak in connection with the furnace. Arguably the jury might have concluded that a reasonable person who is suspicious that a heater might be making them sick would take steps on their own, such as, opening windows and doors to obtain fresh air or vacating the home. Instead, according to Mrs. Fuhrmann’s testimony, it was only after the source of the problem was eliminated, that she, without the advice of Reliant, decided to open the windows and doors.
Our review of the trial record indicates that there is testimony to support a finding that the Reliant dispatcher told the plaintiffs to ventilate their home and to vacate it, although she did not record it in her computer. The fact that she failed to note it does not prove that she did not give the advice. Furthermore, Roberson testified that the doors and windows of the house were open when he arrived at the home. He saw no other people in the home. Finally, we note that Mrs. Fuhrmann’s initial trial testimony regarding when she opened the windows and doors as well as her *1141 testimony regarding the severity and duration of the carbon monoxide poisoning was somewhat impeached by her earlier deposition testimony.
We therefore conclude that the record contains a reasonable basis to support the jury verdict that there was no breach of any duty owed. Accordingly, the judgment of the trial court dismissing the suit is affirmed. Costs of appeal are assessed against the appellants.
AFFIRMED.

. Testimony indicates that the hot water heater, although operating on natural gas, was outside of the home in the laundry room attached to the garage.